**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| **KAPITUS SERVICING, INC.** | **CIVIL CASE NO. 22-1316** |
| **VERSUS** | **JUDGE EDWARDS** |
| **MAC CONTRACTING GROUP, INC., ET AL.** | **MAGISTRATE JUDGE HORNSBY** |

## <u>MEMORANDUM RULING AND ORDER</u>

Before the Court are three Motions for Summary Judgment. First, Plaintiff, Kapitus Servicing, Inc., as agent of Invision Funding, LLC d/b/a Kapitus Servicing ("Kapitus") filed a Motion for Partial Summary Judgment (R. Doc. 86). Defendants MAC Contracting Group, Inc., d/b/a MAC Contracting Group ("MAC"), Jesse Hooker ("Mr. Hooker"), and Amber Estess ("Ms. Estess") (collectively, the "Obligors") oppose the motion (R. Doc. 94). Kapitus replied (R. Doc. 97). Mr. Hooker and Ms. Estess (collectively, the "Guarantors") also filed a Cross-Motion for Summary Judgment (R. Doc. 89). Kapitus opposes the cross-motion (R. Doc. 95). Guarantors replied (R. Doc. 98). Finally, Defendants 318 Hauling, LLC d/b/a 318 Dirt Worx ("318 Dirt Worx"), 318 Auto, LLC d/b/a 318 Towing ("318 Auto"), Sirman Hill, LLC ("Sirman Hill"), and Michael Estess ("Mr. Estess") (collectively, the "Transferee Defendants") filed a Motion for Summary Judgment (R. Doc. 90). Kapitus opposes the motion (R. Doc. 96). Transferee Defendants replied (R. Doc. 99).

After consideration of the parties' memoranda and the applicable law, Kapitus'

Motion is **GRANTED**; Guarantors' Cross-Motion is **DENIED**; and Transferee

Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

This case arises out of commercial transactions between Kapitus and MAC. In

late 2019, and the early part of 2020, MAC was seeking a working capital loan from

the Small Business Administration ("SBA") to assist in funding its operations.[1] MAC

was in the utility construction business, i.e., drainage, paving, and other small

projects.[2] The majority of MAC's work was performed for municipalities and other

governmental bodies.[3] On February 13, 2020, Kapitus advanced a loan to MAC in the

principal amount of $400,000, which required weekly payments of $9,777 for a term

of one year, to repay a total of $508,000.[4] As a result of the COVID-19 pandemic,

MAC's business slowed, which led to MAC exhausting the proceeds of the loan, and

by May 2020, MAC could no longer sustain the weekly payments to Kapitus.[5]

On May 7, 2020, Kapitus agreed to restructure the loan into a Future

Receivables Factoring Agreement (ACH) (the "Merchant Agreement") and related

Merchant Security Agreement and Guaranty, containing both a Security Agreement

(the "Security Agreement") and a Guaranty (the "Guaranty").[6] The Merchant

Agreement provided for the purchase and sale of MAC's future receivables.[7]

---

[1] *See* R. Doc. 89-1 at 4.
[2] *See* R. Doc. 89-1 at 4.
[3] *See* R. Doc. 89-1 at 4.
[4] *See* R. Doc. 89-1 at 5.
[5] *See* R. Doc. 89-1 at 5.
[6] *See* R. Doc. 86-1 at 5.
[7] *See* R. Doc. 86-1 at 6.

Specifically, the "Purchased Amount" (the total dollar amount of receipts to be delivered to Kapitus) was $482,226.08, at a "Purchase Price" (the gross total paid for receipts purchased) of $388,892, of which Kapitus funded $5,000 directly to MAC in May 2020 and applied to the remaining portion of the funding to pay off the balance from the prior loan agreement.[8] Pursuant to the Merchant Agreement, MAC authorized Kapitus to collect the Purchased Amount by withdrawing ACH (Automatic Clearing House) payments from MAC's depositing account at Capital One (the "Capital One Account"), in weekly amounts of $9,268.00.[9]

At the time that MAC entered into the Merchant Agreement, MAC and Guarantors executed the Security Agreement and Guaranty. Pursuant to the Security Agreement, MAC granted Kapitus a security interest in certain collateral which included, its receivables (which said receivables constituted "Receipts" under the Merchant Agreement), as well as inventory, equipment, intangibles, cash, and the proceeds thereof.[10] In the Guaranty, the Guarantors guaranteed to Kapitus MAC's performance of all the representations, warranties, covenants made by MAC in the Merchant Agreement.[11] The Guaranty also provides that "[i]t is understood by all parties that Guarantors are only guaranteeing that they will not take any action or permit [MAC] to take any action that is a breach of this agreement."[12]

---

[8] *See* R. Doc. 86-1 at 6.
[9] *See* R. Doc. 86-1 at 6.
[10] *See* R. Doc. 86-3 at 27.
[11] *See* R. Doc. 86-3 at 28.
[12] *See* R. Doc. 86-3 at 28.

As part of the Merchant Agreement, MAC made numerous warranties, representations, and covenants including (i) to provide Kapitus an accurate representation of the financial state of the business, that MAC was solvent, and to proactively and continually apprise Kapitus of any material adverse changes thereto and (ii) that MAC was not insolvent.[13] Unknown to Kapitus, MAC became insolvent as early as 2018.[14] Kapitus represents that it would not have entered into the Merchant Agreement if it had known that MAC was insolvent at the time the Merchant Agreement was executed.[15]

In July 2020, in addition to depositing the Receipts into the Capital One Account, MAC began depositing the Receipts into a separate operating account at Citizens Bank (the "Citizens Account") without obtaining the prior written consent of Kapitus as required by the Merchant Agreement.[16] In November 2020, Kapitus attempted to debit the Capital One Account, but the ACH payment was rejected due to insufficient funds.[17] When Kapitus again attempted to debit the Capital One Account in January 2021, Kapitus discovered that the Capital One Account had been closed.[18]

On February 22, 2021, Kapitus filed suit in the Circuit Court of the County of Hanover, Virginia, against MAC, Mr. Hooker, and Ms. Estess.[19] The Complaint listed

---

[13] *See* R. Doc. 86-3 at 23–24.
[14] *See* R. Doc. 94 at 8.
[15] *See* R. Doc. 86-1 at 16.
[16] *See* R. Doc. 86-1 at 12–14.
[17] *See* R. Doc. 86-1 at 14.
[18] *See* R. Doc. 86-1 at 15.
[19] *See* R. Doc. 89-1 at 6.

two counts, which entailed four causes of action.[20] Count 1 was a breach of contract claim alleging causes of action arising out of the default of the Merchant Agreement.[21] Count 2 alleged causes of action for fraud in the inducement of the Merchant Agreement.[22] However, Kapitus "nonsuited" the Virginia lawsuit on April 13, 2022, after it discovered that MAC had caused certain transfers to be made to parties owned and operated by Mr. Estess, including the transfers to the Transferee Defendants from 2020 through 2023.[23] These transfers include a lump payment to Mr. Estess from MAC, multiple loans from MAC to 318 Auto and 318 Dirt Worx, and multiple payments from MAC to Sirman Hill.[24]

On May 18, 2022, Kapitus filed the instant lawsuit.[25] In its Second Amended Complaint, Kapitus alleges breach of contract claims against MAC, Mr. Hooker, and Ms. Estess, and a revocatory action against MAC, 318 Dirt Worx, 318 Auto, Sirman Hill, Mr. Estess, 318 Towing, LLC, and Freedom Roofing, LLC.[26]

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[20] *See* R. Doc. 89-1 at 6.

[21] *See* R. Doc. 89-1 at 6.

[22] *See* R. Doc. 89-1 at 6.

[23] *See* R. Doc. 96 at 6–7. "Nonsuit" is "[a] plaintiff's dismissal of a case or of a defendant, without a decision on the merits." Black's Law Dictionary (12th ed. 2024). However, Mr. Hooker and Ms. Estess contend that the nonsuit occurred only after a ruling in their favor by the Virginia court. R. Doc. 89-1 at 7.

[24] *See* R. Doc. 96 at 10.

[25] *See* R. Doc. 1.

[26] *See* R. Doc. 46. Freedom Roofing, LLC has not joined in the motion filed by the Transferee Defendants. The record is unclear as to whether 318 Towing, LLC is a separate entity from 318 Auto, LLC d/b/a/ 318 Towing. In the event 318 Towing, LLC is a separate entity it has not joined the motion filed by the Transferee Defendants.

matter of law."[27] A material fact impacts the outcome of a lawsuit and can be identified through substantive law.[28] A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could render a verdict for the nonmoving party."[29] "[A] party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record."[30]

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings ... [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[31] If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists.[32] A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[33] Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."[34]

---

[27] Fed. R. Civ. P. 56(a).
[28] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[29] *Id.*
[30] Fed. R. Civ. P. 56(c)(1)(A).
[31] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citations omitted).
[32] *Id.* at 324.
[33] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[34] *Clark v. Am's Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).

In reviewing the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[35] The district court will not "evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes."[36] Factual controversies are to be resolved in favor of the nonmovant, "but only when … both parties have submitted evidence of contradictory facts."[37]

### III.   CHOICE OF LAW

The Merchant Agreement provides that any legal dispute arising from or relating to the agreement is to be construed in accordance with Virginia law.[38] Because the Court has diversity jurisdiction over this matter, the Court applies the choice of law principles of the forum state, in this case Louisiana.[39] Louisiana's choice of law principles regarding contracts are contained in Louisiana Civil Code articles 3537-3541. Louisiana law generally "allows parties to select the law that will determine the outcome of disputes arising from a contract."[40]

"Louisiana allows parties to stipulate in their contracts which state's laws are to govern them. Such contractual stipulations are not honored, however, where there are legal or strong public policy considerations justifying the refusal to honor the

---

[35] *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 150 (2000).

[36] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

[37] *Little*, 37 F.3d at 1075.

[38] *See* R. Doc. 86-3 at 24–25.

[39] *Abraham v. State Farm Mutual Auto. Ins. Co.*, 465 F.3d 609, 610 (5th Cir. 2006); *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 674 (5th Cir. 2003) (citation omitted); *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[40] *Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 250 (5th Cir. 2001) (citing La. Civ. Code art. 3540); *Chance v. Designer Wardrobe Trailers, Inc.*, 2009 WL 799963, at *3 (E.D. La. Mar. 24, 2009).

contract as written."[41] The Merchant Agreement contains a valid Virginia choice of law clause, and neither Kapitus nor the Obligors dispute its applicability. Even if they did dispute its applicability, neither party has pointed to any legal or strong public policy consideration militating against its enforcement. Accordingly, the Court will apply Virginia law when analyzing Kapitus' breach of contract claims against the Obligors. However, the revocatory action was brought pursuant to Louisiana law, and thus, those claims will be analyzed under Louisiana law.

## IV.   ANALYSIS

### a.  *Breach of Contract*

Kapitus moves for summary judgment on its breach of contract claims against MAC for allegedly breaching the Merchant Agreement and against Guarantors for allegedly breaching the Guaranty. Guarantors cross-move for summary judgment against Kapitus on its breach of contract claim against them. As stated previously, the breach of contract claims will be analyzed under Virginia law. To establish a breach of contract claim in Virginia, a plaintiff must prove: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."[42]

---

[41] *Kirkland v. Deluxe Small Bus. Sales, Inc.*, 2016 WL 9402787, at *4 n.14 (M.D. La. July 27, 2016) (citing *NCH Corp. v. Broyles*, 749 F.2d 247, 250 (5th Cir. 1985)); *Delhomme Indus., Inc. v. Hous. Beechcraft, Inc.*, 669 F.2d 1049, 1058 (5th Cir. 1982) (internal citations and quotations omitted).
[42] *Ramos v. Wells Fargo Bank, NA,* 770 S.E.2d 491, 493 (Va. 2015) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

### i. Claim Against MAC

The parties do not dispute the validity of the Merchant Agreement, nor do they dispute whether there is a legally enforceable obligation between the parties. Thus, the first element is satisfied. Kapitus alleges that MAC breached Sections 1.9, 2.1, 2.9, and 3.1 of the Merchant Agreement.[43] Section 1.9 of the Merchant Agreement sets forth "Protections Against Default," which lists certain protections that may be invoked by Kapitus immediately and without notice to MAC in the event:

> (a) [MAC] Changes its deposit relationships with any financial institution in any way that interferes with [Kapitus'] collection the Receipts due; (b) [MAC] closes or changes the bank account(s) through which the Receipts are settled, or permits any event to occur that could cause diversion of any of [MAC]'s transactions to another bank account; (c) [MAC] … moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of [Kapitus], and (ii) the written agreement of purchaser or transferee to the assumption of all of [MAC]'s obligations under this Agreement pursuant to documentation satisfactory to [Kapitus]; or (d) any debit of the specified amount is rejected or returned due to insufficient funds and [MAC] fails to contact [Kapitus] within three (3) business days.[44]

Section 3.1 of the Merchant Agreement, entitled "Events of Default," provides that the occurrence of certain events, including but not limited to the following shall constitute an "Event of Default" under the Merchant Agreement:

> (a) [MAC] shall violate any term or covenant in this Agreement; (b) Any representation or warranty by [MAC] in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made … (i) [MAC] shall use multiple depository accounts without the prior written consent of [Kapitus]; [or] (j) [MAC] shall change its bank account without the prior written consent of [Kapitus].[45]

---

[43] *See* R. Doc. 86-1 at 24.
[44] *See* R. Doc. 86-3 at 23.
[45] *See* R. Doc. 86-3 at 24.

Additionally, MAC made numerous other warranties, representations, and covenants within Section II of the Merchant Agreement, including (i) in Section 2.1 to provide Kapitus an accurate representation of the financial state of the business, that MAC was solvent, and to proactively and continually apprise Kapitus of any material adverse changes thereto and (ii) in Section 2.9 that MAC was not insolvent.[46]

Kapitus alleges that MAC breached these Sections of the Merchant Agreement in "numerous ways, including but not limited to (1) diverting the Receipts into the Citizens Account without Kapitus' prior knowledge or consent; (2) using multiple deposit accounts without Kapitus' prior knowledge or consent; (3) permitting a payment to be rejected for insufficient funds and thereafter failing to timely notify Kapitus; (4) closing the Capital One Account without Kapitus' prior knowledge or consent; (5) selling or transferring certain business assets without first obtaining Kapitus' express written consent or the purchaser and/or transferee's assumption of [MAC]'s obligations under the Merchant Agreement; and (6) breaching certain terms, representations, warranties, and covenants of the Merchant Agreement as to [MAC]'s solvency."[47] As a result of these breaches, Kapitus asserts that it is entitled to damages under the Default Provisions of the Merchant Agreement.[48]

MAC first contends that it had to open the Citizens Account in order to receive funding for a PPP loan offered by the government because Capital One was not processing PPP loans at that time.[49] Next, MAC contends that Kapitus was not

---

[46] *See* R. Doc. 86-3 at 23–24.
[47] *See* R. Doc. 86-1 at 24.
[48] *See* R. Doc. 86-1 at 8–10.
[49] *See* R. Doc. 94 at 6.

10

entitled to all of the receipts deposited into the Citizens Account because only seven percent of the receivables generated by MAC would be subject to the claims of Kapitus.[50] MAC also claims that it was "forced to close the Capital One account as Kapitus kept debiting the account when there were insufficient funds."[51] Finally, MAC contends that Kapitus knew of its insolvency at the time that the agreement was signed.[52] MAC attached its 2018 tax return and Kapitus' platform notes from February 3, 2020, which includes a line item called "Prior Year Tax Return."[53] MAC argues that these show that Kapitus entered into the Merchant Agreement with MAC knowing that it was insolvent to take advantage of MAC for a profit.[54]

In response, Kapitus asserts that MAC did not dispute the occurrence of any of the six events of default described in their motion.[55] Kapitus contends that MAC opening the Citizens Account to obtain a PPP loan does not negate or attempt to explain why MAC opened the account without Kapitus' consent as required by the Merchant Agreement.[56] Further, Kapitus contends that MAC did not provide an explanation as to why they deposited nearly $1.2 million dollars' worth of receivables from its customers into the Citizens Account, which is also a breach of the Merchant Agreement.[57] Lastly, Kapitus contends that MAC's arguments and evidence

---

[50] *See* R. Doc. 94 at 6–7.
[51] *See* R. Doc. 94-2 at 2.
[52] *See* R. Doc. 94 at 7–9.
[53] *See* R. Docs. 94-3, 94-4.
[54] *See* R. Doc. 94 at 9.
[55] *See* R. Doc. 97 at 2.
[56] *See* R. Doc. 97 at 3.
[57] *See* R. Doc. 97 at 3–4.

regarding its solvency and Kapitus' alleged knowledge of its insolvency is "an outrageous theory" that is "based on nothing but pure speculation and hyperbole."[58]

With respect to opening the Citizens Account and depositing receivables into it, Kapitus is correct that those actions violated Section 1.9 and constituted an Event of Default under Section 3.1.[59] Further, MAC was insolvent at the time it entered into the Merchant Agreement with Kapitus, which is a violation of Section II wherein MAC represented that it was not insolvent.[60] MAC's claims that Kapitus knew of its insolvency when the Merchant Agreement was entered into cannot defeat summary judgment because it is not supported by direct evidence and it is not a reasonable inference the Court can make in MAC's favor as it is contradicted by the representations made in the Merchant Agreement.[61] As a result of its violations, MAC is in default of the Merchant Agreement under Section 3.1. As such, the second element of Kapitus' breach of contract claim is met.

With respect to the final element of its breach of contract claim against MAC, Kapitus claims that MAC's breaches have prevented Kapitus from collecting all amounts due under the Merchant Agreement.[62] Pursuant to Section 3.2, if "any Event of Default occurs … [Kapitus] may proceed to protect and enforce its rights or

---

[58] *See* R. Doc. 97 at 6.
[59] *See* R. Doc. 86-3 at 23, § 1.9 ("The following Protections 1 through 6 may be invoked by [Kapitus], immediately and without notice to [MAC] in the event (a) [MAC] changes its deposit relationships with any financial institution in any way that interferes with [Kapitus'] collection of the Receipts due; (b) [MAC] closes or changes the bank account(s) through which the Receipts are settled, or permits any event to occur that could cause diversion of any of [MAC]'s transactions to another bank account".).
[60] *See* R. Doc. 86-3 at 23–24.
[61] *See Williams v. BP Expl. & Prod., Inc.*, 143 F.4th 593, 602 (5th Cir. 2025) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.") (citations omitted).
[62] *See* R. Doc. 86-1 at 24.

remedies by suit in equity or by action at law, or both, … to enforce the discharge of [MAC]'s obligations hereunder."[63] Under Section 1.9, "[t]he full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately."[64] "Protection 5" of Section 1.9 states that "[Kapitus]" may proceed to protect and enforce its rights by lawsuit, in which [Kapitus] shall recover judgment against [MAC], [MAC] shall be liable for all of [Kapitus'] costs of lawsuit, including but not limited to attorneys' fees of twenty-five percent (25%) of any balance due, court costs, and expenses."[65] MAC did not contest the amount of damages claimed by Kapitus. As such, the third element is met. Accordingly, Kapitus' motion for partial summary judgment against MAC on its breach of contract claim is granted.

### ii. Claim Against Guarantors

Kapitus and Guarantors cross-move for summary judgment on Kapitus' breach of contract claim against Guarantors for their alleged breach of the Guaranty. The Guaranty, signed by Guarantors as "Owner/Guarantor," provides, in pertinent part:

> Personal Guaranty of Performance. The undersigned Guarantor(s) hereby guarantees to [Kapitus] [MAC]'s performance of all of the representations, warranties, covenants made by [MAC] in this Agreement and the Merchant Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantors' obligations are due (i) at the time of any breach by [MAC] of any representation, warranty, or covenant made by [MAC] in this Agreement and the Merchant Agreement … (It is understood by all parties that Guarantors are only guaranteeing that

---

[63] *See* R. Doc. 86-3 at 24.
[64] *See* R. Doc. 86-3 at 23.
[65] *See* R. Doc. 86-3 at 23.

13

they will not take any action or permit [MAC] to take any action that is a breach of this agreement.)[66]

Neither party contests the legal enforceability of the Guaranty; however, the Parties differ in their interpretations of the Guaranty and the damages stemming from a breach. In Virginia, contract interpretation is a pure question of law for a court to decide.[67] To interpret a contract, a court "construe [it] as it is written."[68] The "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning"; "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it[;] and there is a presumption that the parties have not used words needlessly."[69]

A guaranty is "an independent contract, by which the guarantor undertakes, in writing, upon a sufficient undertaking, to be answerable for the debt, or for the performance of some duty, in case of the failure of some other person who is primarily liable to pay or perform."[70] Contracts must be construed "as a whole," with all provisions "harmonized, giving effect to each when reasonably possible."[71] In addition, "where parties have entered into more than one document relating to a business transaction, 'these documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others.'"[72]

---

[66] *See* R. Doc. 86-3 at 28–29.

[67] *Bolton v. McKinney*, 855 S.E.2d 853, 855 (Va. 2021).

[68] *Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc.*, 662 S.E.2d 77, 80 (Va. 2008).

[69] *PMA Cap. Ins. Co. v. U.S. Airways, Inc.*, 626 S.E.2d 369, 372–73 (Va. 2006).

[70] *McDonald v. Nat'l Enters., Inc.*, 547 S.E.2d 204, 207 (Va. 2001) (quoting *B.F. Goodrich Rubber Co., Inc. v. Fisch*, 127 S.E. 187, 188 (Va. 1925)).

[71] *Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013).

[72] *Am. Realty Tr. v. Chase Manhattan Bank, N.A.*, 281 S.E.2d 825, 831–32 (Va. 1981) (quoting *J.M. Turner & Co. v. Delaney*, 176 S.E.2d 422, 425 (Va. 1970).

Guarantors assert that no matter how the Guaranty is read, there is no "promise to pay" the debt of MAC by Guarantors.[73] They argue that the phrase "representations, warranties, covenants made by [MAC]" does not mean a guaranty of the entire Merchant Agreement.[74] Instead, they argue that the phrase is limiting and only obligates Guarantors to perform the obligations that are listed in Section II of the Merchant Agreement, which is entitled "REPRESENTATIONS, WARRANTIES AND COVENANTS."[75] Within Section II, there are thirteen subparagraphs, and according to Guarantors, not one of those subparagraphs includes payment of the debt owed by MAC to Kapitus.[76]

Guarantors further argue that Kapitus has not proven how and to what extent it was damaged by the breach of Sections 2.1 and 2.9.[77] They state that "Kapitus just assumes that all damages equate to the amount due under the agreement. While that might be true for MAC, it is not true vis-à-vis the guarantors."[78] They further argue that the Declaration of Kapitus' employee David Wolfson, "proves that the actions by [Guarantors] caused no damage to Kapitus," because MAC would have remained in default of the original loan if Kapitus had not entered into the Merchant Agreement.[79]

Kapitus avers that the Guaranty is one of performance, that when the agreements between Kapitus and the Obligors are read as a whole, MAC's failure to perform under the Merchant Agreement means Guarantors' obligations are due, and

---

[73] *See* R. Doc. 89-1 at 11.
[74] *See* R. Doc. 89-1 at 12.
[75] *See* R. Doc. 89-1 at 12–13; *see also* R. Doc. 86-3 at 23–24.
[76] *See* R. Doc. 89-1 at 12–13.
[77] *See* R. Doc. 94 at 12.
[78] *See* R. Doc. 94 at 12.
[79] *See* R. Doc. 94 at 12.

Guarantors are liable for MAC's obligations under the Merchant Agreement.[80] Kapitus argues that if "the Guaranty has no effect beyond what the Guarantors claim it does, there would be nothing serious for the Guarantors to acknowledge because they would have no personal liability to pay anything under the Agreement under any circumstances."[81] With regard to damages, Kapitus avers that its calculation of damages due to the Guarantors' breach of the Guaranty is the balance owed under the Merchant Agreement, which constitutes the receivables that Kapitus purchased but never recovered.[82]

Kapitus is correct. If the Guaranty was only limited to the performance of Section II of the Merchant Agreement, and no other provision could be taken into account, then numerous provisions of the Merchant Agreement, Security Agreement, and Guaranty would be redundant and meaningless.[83]

Here, Guarantors guaranteed that they would not permit MAC to take any action—i.e., provide false or misleading information regarding its solvency—that is a breach of the Merchant Agreement. As discussed *supra*, MAC's representations that it was solvent in Section 2.1 and not insolvent in Section 2.9 of the Merchant Agreement were false and constitute an Event of Default under Section 3.1. MAC and Guarantors even admitted as much.[84] Pursuant to Section 3.2, if "any Event of

---

[80] *See* R. Doc. 86-1 at 17.

[81] *See* R. Doc. 95 at 11.

[82] *See* R. Doc. 97 at 8.

[83] *PMA*, 626 S.E.2d at 372–73 ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it[;] and there is a presumption that the parties have not used words needlessly.").

[84] *See* R. Doc. 94 at 8–9 ("Certainly, Kapitus knew of the insolvency of MAC as early as February 2020. … Indeed, it is clear that Kapitus had full knowledge that it had an insolvent fish on the hook, and intended to reel it in as profitably as possible.").

Default occurs ... [Kapitus] may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, ... to enforce the discharge of [MAC]'s obligations hereunder (including the Personal Guaranty)."[85] The Merchant Agreement clearly states "[i]f any information provided to [Kapitus] is determined to be false or misleading, [MAC] shall be deemed in material breach of all agreements between [MAC] and [Kapitus] and Owner(s) shall be personally liable for [MAC]'s obligations under the Personal Guaranty of Performance."[86] Thus, Mr. Hooker and Ms. Estess, each of whom signed the Guaranty as "Owner/Guarantor,"[87] are liable for MAC's obligations under the Merchant Agreement. Accordingly, Kapitus' motion for partial summary judgment against the Guarantors is granted, and the Guarantors' motion is denied. Since the obligations under the Guaranty are joint and several, MAC, Mr. Hooker, and Ms. Estess are jointly and severally liable to Kapitus for its damages.[88]

### b. *Revocatory Action*

The Transferee Defendants moved for summary judgment on the revocatory action claims alleged against them by Kapitus. The revocatory action derives from Louisiana Civil Code article 2036, which provides that "[a]n obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's

---

[85] *See* R. Doc. 86-3 at 24.
[86] *See* R. Doc. 86-3 at 21–22.
[87] *See* R. Doc. 86-3 at 29.
[88] *See* R. Doc. 86-3 at 28.

insolvency." An obligee may not annul a contract made by the obligor in the regular course of business.[89]

In order for Kapitus to annul an act of the MAC, it must show: (1) an act (or failure to act) of MAC that causes or increases the MAC's insolvency, and; (2) the act must occur after the Kapitus' rights arose.[90] In addition, the obligee must prove prejudice, injury, or damage to the obligee as a result of the act.[91] The test for determining prejudice or injury is factual, based on the value of the property and the ranking of the indebtedness.[92]

### i. Transfers to 318 Dirt Worx and 318 Auto

The definition of insolvency as it relates to a revocatory action is found in Louisiana Civil Code article 2037, which provides that "[a]n obligor is insolvent when the total of his liabilities exceeds the total of his fairly appraised assets." The Transferee Defendants assert that the transfers to 318 Dirt Worx and 318 Auto are not subject to Kapitus' revocatory action because they did not increase MAC's insolvency.[93] According to the Transferee Defendants, the transfers were at least balance sheet neutral but may have actually decreased MAC's insolvency.[94]

The transfers in question are two purported loans from MAC to 318 Dirt Worx and 318 Auto. As evidence of the loan to 318 Dirt Worx, Transferee Defendants produced a Loan Agreement dated November 10, 2021 (the "Dirt Worx Loan

---

[89] LA. CIV. CODE ART. 2040.
[90] *Long Duc Bui v. Mughal*, 266 So.3d 494, 498 (La. App. 2 Cir. 2/27/19).
[91] *Parish Nat. Bank v. Wilks,* 923 So.2d 8, 16 (La. App. 1 Cir.8/3/05).
[92] *Dortch v. Rollins*, 181 So. 3d 911, 917 (La. App. 2 Cir. 12/9/15).
[93] *See* R. Doc. 90-1 at 10–17.
[94] *See* R. Doc. 90-1 at 10–17.

Agreement") which describes a loan in the sum of $265,000.[95] The source of the funds loaned to 318 Dirt Worx came from the proceeds of an SBA loan received by MAC ("SBA Loan 2367199101") on November 6, 2021, in the amount of $1,500,000.[96] The Dirt Worx Loan Agreement states that the "loan term and payment amount mirror that of SBA [ ] Loan 2367199101. The Loan shall be payable in [monthly] installments equal to $7,723.00."[97] As evidence of the loan to 318 Auto, Transferee Defendants produced a Loan Agreement dated January 1, 2022 (the "Auto Loan Agreement"). The source of the funds loaned to 318 Auto came from the proceeds of an SBA loan received by MAC ("SBA Loan 3211827204") on April 19, 2020, in the amount of $500,000.[98] Similar to the Dirt Worx Loan Agreement, the loan term and payment amount mirror SBA Loan 3211827204, payable in monthly installments of $2,437.[99]

Notably, the Loan Agreements were personally drafted by Mr. Estess.[100] Not only that, but the Loan Agreements were signed by Mr. Estess as the lender, borrower, and guarantor.[101] Further, while the Loan Agreements are seemingly structured as loans repayable to MAC, Mr. Estess testified in his deposition that 318 Dirt Worx and 318 Auto had actually assumed MAC's indebtedness evidenced by the SBA Loans.[102]

---

[95] *See* R. Doc. 90-3. The Court notes that the loan was made to 318 Hauling, LLC ("318 Hauling"), however, 318 Hauling changed its name to 318 Dirt Worx on March 15, 2021. *See* R. Doc. 86-7 at 121.

[96] *See* R. Doc. 90-1 at 12.

[97] *See* R. Doc. 90-3 at 1.

[98] *See* R. Doc. 90-1 at 15.

[99] *See* R. Doc. 90-4 at 1.

[100] *See* R. Doc. 86-7 at 132.

[101] *See* R. Doc. 90-3 at 3; *see also* R. Doc. 90-4 at 3.

[102] *See* R. Doc. 86-7 at 133. Kapitus notes multiple times in their brief that MAC did not obtain prior approval from the SBA to transfer the money from the loans to 318 Dirt Worx and 318 Auto. *See* R. Doc. 96 at 22. However, as pointed out by Transferee Defendants, this is not at issue here. *See* R. Doc. 99 at 2.

The Court finds that Kapitus has provided competent summary judgment evidence to create a genuine issue of material fact as to the effect of the transfers on MAC's insolvency. Kapitus attached an expert report that evaluated the solvency of MAC.[103] Within the report, the expert analyzed the transfers made by MAC between February 2020 and July 2023. In the report, the expert stated, "the total intercompany transfers out and in from February 1, 2020, through July 31, 2023, totaled $621,129 and $218,109, respectively. The net intercompany transfers from MAC to Transferees totaled ($403,020) and contributed to MAC's overall insolvency subsequent to 2018."[104] Consequently, he concluded that "[t]he intercompany transfer activity from February 2020 through July 31, 2023 contributed to MAC's overall cash flow problems and further increased the Company's insolvency."[105]

Transferee Defendants providing sample—as opposed to actual—balance sheets cannot prove solvency such that summary judgment on this issue could be granted.[106] With nothing more than Mr. Estess' controverted deposition testimony, the Court finds that Kapitus has created a genuine issue of material fact as to whether the transfers from MAC to 318 Auto and 318 Dirt Worx increased the insolvency of MAC. Accordingly, Transferee Defendants' motion for summary judgment on these claims is denied.

---

[103] *See* R. Doc. 96-1.
[104] *See* R. Doc. 96-1 at 24.
[105] *See* R. Doc. 96-1 at 26.
[106] *See* R. Doc. 99 at 3–4.

### ii.  Transfers to Sirman Hill and Mr. Estess

The Transferee Defendants also claim that they are entitled to summary judgment regarding the transfers to Sirman Hill and Mr. Estess because they were in payment of legitimate debts and in the regular course of business.[107] "An obligor's payment of a just and due debt may not be annulled under this Article. Although it reduces his assets, it also reduces his liabilities by the same amount."[108] Further, "[a]n obligee may not annul a contract made by the obligor in the regular course of business."[109]

On February 1, 2021, MAC signed a Management Agreement with Sirman Hill—a management company whose sole member was Mr. Estess—to represent MAC in all of the company's affairs including the completion of all projects and corporate business.[110] As part of the Management Agreement, Sirman Hill was to be paid $2,500 per week for these services by MAC.[111] Sirman Hill's duties, as it relates to MAC, included conducting wind-down operations of the company and help finish any remaining projects.[112] According to Transferee Defendants, the work performed by Sirman Hill was necessary and exhaustive, and the compensation paid was fully earned, reasonable in its amount, and in the regular course of business.[113]

---

[107] *See* R. Doc. 90-1 at 17–20.
[108] LA. CIV. CODE ART. 2036 cmt. (h).
[109] LA. CIV. CODE ART. 2040.
[110] *See* R. Doc. 90-1 at 17; *see also* R. Doc. 90-5.
[111] *See* R. Doc. 90-1 at 17.
[112] *See* R. Doc. 90-1 at 18–19.
[113] *See* R. Doc. 90-1 at 20.

Kapitus claims that the payments to Sirman Hill "are extremely suspect and Kapitus disputes that sufficient consideration was provided therefore."[114] Kapitus questions the reasonableness of the $2,500 per week payment because MAC just used "google searches and stuff" when trying to arrive at an appropriate compensation for Sirman Hill.[115] Kapitus asserts that "it appears that Sirman Hill was created by Mr. Estess to shield himself from personal liability."[116] However, Kapitus presents no competent summary judgment evidence to support this allegation.

The law is clear that "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."[117] The Court finds that the payments to Sirman Hill were made in the regular course of business as compensation for the services provided. Accordingly, Transferee Defendants' motion for summary judgment is granted on Kapitus' revocatory action claims regarding the transfers to Sirman Hill because they were made in the "regular course of business" and not subject to revocation.

The transfer to Mr. Estess was a payment of $58,705.18 made to him from MAC in November 2021.[118] Supposedly, the payment was a one-time transfer to Mr. Estess—made by Mr. Estess—to pay several years of unpaid income taxes.[119]

---

[114] *See* R. Doc. 96 at 24.
[115] *See* R. Doc. 96 at 24.
[116] *See* R. Doc. 96 at 24.
[117] *Williams*, 143 F.4th at 602.
[118] *See* R. Doc. 90-1 at 20.
[119] *See* R. Doc. 90-7 at 30–31 ("**Q**: Who decided to make that payment? **A**: Me. **Q**: Okay. Did Ms. Estess or Mr. Hooker know? **A**: No. **Q**: How did you cause MAC to make that payment to you? **A**: I paid – sent a payment to the IRS in that amount. **Q**: Okay. And that makes sense, because we'll look at the bank statement, and there is an – so was that for your taxes? **A**: Yeah. **Q**: Okay. And what – was that your income taxes? **A**: Yeah. Taxes I owed. **Q**: So what happened there is MAC paid your taxes for you. **A**: Basically. **Q**: Okay. Directly. **A**: Directly.").

According to the Transferee Defendants, this type of payment "is not an uncommon transaction in a closely held corporation."[120] Further, they assert that the payment made to him was a payment that had been "earned by him in previous periods."[121] As such, the transfer was "just a debt of MAC, and made in the normal course of business."[122]

Kapitus first contends that the transfer is not subject to annulment under Article 2040 because the Transferee Defendants have not alleged a contract, and Article 2040 only applies to "contracts" made by an obligor in the regular course of business.[123] Further, Kapitus contends that since Mr. Estess was not an owner of MAC, it is unclear why MAC would be paying his personal income taxes.[124] Kapitus claims that the payment was not authorized by MAC's principals and was made when MAC was insolvent and had been telling its vendors and customers that it was ceasing operations.[125]

The Court finds that Kapitus has established a genuine issue of material fact as to whether the one-time transfer to Mr. Estess was made in the "regular course of business" as Transferee Defendants claim. While "regular course of business" is not defined by article 2040, "prior dealings between the parties might be an indicia of [regular] course of business."[126] In this case, the prior dealings between Mr. Estess

---

[120] *See* R. Doc. 90-1 at 20.
[121] *See* R. Doc. 90-1 at 20.
[122] *See* R. Doc. 90-1 at 20.
[123] *See* R. Doc. 96 at 23; LA. CIV. CODE ART. 2040 ("An obligee may not annul a *contract* made by the obligor in the regular course of business.") (emphasis added).
[124] *See* R. Doc. 96 at 23.
[125] *See* R. Doc. 96 at 24.
[126] *See In re WRT Energy Corp.*, 282 B.R. 343, 416 (Bankr. W.D. La. 2001).

and MAC include a weekly salary of $2,000 per week as the "Operations Manager of MAC through July 2021.[127] Then, beginning in August 2021, MAC started weekly transfers to Sirman Hill pursuant to the Management Agreement. Nowhere in the prior dealings, however, are any lump sum payments similar to the one at issue. Further, although Transferee Defendants assert that the transfer was for money earned in previous periods, they supply no evidence to support that assertion. As such, a genuine issue of material fact exists as to the nature of the payment to Mr. Estess. Accordingly, Transferee Defendants' motion for summary judgment on Kapitus' revocatory action claim regarding the $58,705.18 transfer to Mr. Estess is denied.

## V.    CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that Kapitus' Motion for Partial Summary Judgment is **GRANTED**. Within thirty (30) days of this Order, Kapitus shall submit a brief, supported by affidavit, on damages, including attorneys' fees, costs, and interests. Any opposition to the amounts claimed shall be submitted within thirty (30) days after Kaptius' brief.

**IT IS FURTHER ORDERED** that Guarantors' Cross-Motion for Summary Judgment is **DENIED**.

---

[127] *See* R. Doc. 96 at 12.

**IT IS FURTHER ORDERED** that Transferee Defendants' Motion for Summary Judgment is **GRANTED** insofar as Kapitus' revocatory action regarding the transfers to Sirman Hill.

**IT IS FURTHER ORDERED** that Transferee Defendants' Motion for Summary Judgment is **DENIED** as to the transfers to 318 Auto, 318 Dirt Worx, and Mr. Estess.

**IT IS FURTHER ORDERED** that this matter is referred to the Magistrate Judge for a scheduling conference on the remaining claims.

**THUS DONE AND SIGNED** this 5th day of January, 2026.

_____
**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**